**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-13814
_____

STATE OF FLORIDA,

*Plaintiff-Appellant,*

*versus*

SECRETARY, US DEPARTMENT OF EDUCATION,
UNDER SECRETARY, US DEPARTMENT OF EDUCATION,
ASSISTANT SECRETARY FOR POSTSECONDARY
EDUCATION,
DIRECTOR, ACCREDITATION GROUP,
OFFICE OF POSTSECONDARY EDUCATION,
CHIEF OPERATING OFFICER, FEDERAL STUDENT AID, et
al.,

*Defendants-Appellees.*

———————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:23-cv-61188-JB

———————————————

Before WILLIAM PRYOR, Chief Judge, and BRASHER and ABUDU, Circuit Judges.

BRASHER, Circuit Judge:

The question in this appeal is whether the Department of Education may constitutionally rely on private educational accreditors in disbursing federal education funds. The Higher Education Act requires that, for their students to be eligible for federal financial aid, colleges and universities must be accredited by a recognized accreditor. Accreditors are private, voluntary organizations that are usually funded by the schools or programs that they accredit. The State of Florida says that, by requiring accreditation, Congress and the Department of Education have unconstitutionally delegated governmental power to these private accreditors and that the accreditors should be, but have not been, appointed as federal officers. Florida also says that the accreditation requirement is an unascertainable, and therefore unconstitutional, condition attached to federal funds provided to States. After careful consideration and with the benefit of oral argument, we disagree. The accreditation requirement is neither a delegation of government power nor an unascertainable condition. Because the district court dismissed Florida's suit for failure to state a claim upon which relief may be granted, we affirm.

## I.

Accrediting agencies have been accrediting educational institutions and their programs since the late nineteenth century. ALEXANDRA HEGJI, CONG. RSCH. SERV., R43826, AN OVERVIEW OF ACCREDITATION OF HIGHER EDUCATION IN THE UNITED STATES 1 (2024). Their primary function was to provide an assurance of quality for postsecondary education institutions and programs. *See id.* at 1–2. Accreditors are primarily funded by the schools and programs they accredit, and membership in an accrediting agency is voluntary. *Id.* at 4.

When the federal government began funding higher education through the Higher Education Act, it incorporated accreditation. The main source of funding in the Higher Education Act is federal student financial aid, such as Pell Grants and Direct Loans. *Id.* at 1. Authorized in Title IV of the Act, federal student aid now comprises billions of dollars per year. *Id.* To ensure that educational institutions that receive these Title IV dollars perform at a minimum level of quality, Congress requires that they be accredited. *Id.* In fact, Congress has required accreditation as a condition for federal financial aid eligibility since the 1952 GI Bill. *See* Veterans' Readjustment Assistance Act of 1952, Pub. L. No. 82-550, § 253, 66 Stat. 663, 675 (first incorporation of private accreditors into higher education funding); Higher Education Act of 1965, Pub. L. No. 89-329, §§ 302(c), 435(a), 441(3), 123(b)(1), 79 Stat. 1219, 1229, 1247–50 (expanding higher education funding). For an insti-

4                    Opinion of the Court                    24-13814

tution's students to be eligible to receive Title IV financial aid to-day, educational institutions must be: (1) accredited, 20 U.S.C. § 1001(a)(5); (2) authorized to provide a program of postsecondary education within their states, *id.* § 1001(a)(2); and (3) certified by the Department of Education as having satisfied these requirements as well as having administrative capability and financial responsibility, *id.* § 1099c(a). If institutions are eligible, students may receive Title IV financial aid to spend at those institutions.

Accreditation will satisfy the statute only if the Department of Education recognizes the accreditor. *Id.* § 1001(a)(5) (requiring institutions to be accredited by "a nationally recognized accrediting agency or association"). The Higher Education Act specifies several broad requirements that accreditors must satisfy for the Department to recognize them. *See id.* § 1099b. These requirements include that a private accreditor must have "voluntary membership"; "consistently appl[y] and enforce[]" accreditation standards "that respect the stated mission of the institution of higher education" and "ensure that the courses or programs" that the institution offers "are of sufficient quality to achieve" their stated objectives; and have accreditation standards that assess each institution's "success with respect to student achievement," curricula, faculty, fiscal soundness, recruiting and admissions, program length, student complaints, facilities, equipment, and supplies. *Id.* § 1099b(a)(2)–(5).

Historically, the Southern Association of Colleges and Schools Commission on Colleges has served as the accreditor for

24-13814                Opinion of the Court                5

Florida's state colleges and universities. But the State of Florida has not always had a smooth relationship with SACS. Over a decade ago, Governor Rick Scott suggested that the president of Florida A&M be suspended following a deadly hazing incident, but SACS threatened to withhold Florida A&M's accreditation if the university were to act under the Governor's influence. Am. Council of Trs. & Alumni, *Florida Rising: An Assessment of Public Universities in the Sunshine State* 39 (June 2013), https://www.goacta.org/wp-content/uploads/2013/06/florida_rising.pdf [https://perma.cc/2XXS-RP8B]. SACS later said that it was launching an inquiry into Governor Scott's meeting with a prospective candidate to replace the incumbent president at the University of Florida. Tia Mitchell, *Gov. Rick Scott's involvement in UF president decision under review*, TAMPA BAY TIMES (Jan. 18, 2013), https://www.tampabay.com/news/education/college/gov-rick-scotts-involvement-in-uf-president-decision-under-review/1271239/ [https://perma.cc/5KE8-TBEM]. And recently, SACS threatened to revoke Florida State University's accreditation because the Florida Board of Governors considered appointing the Florida Commissioner of Education as its next president, and SACS hinted that "some of the candidates" being considered (such as the Commissioner) lacked "appropriate experience and qualifications." Letter to Sydney Kitson, Chair, Fla. Bd. of Governors, from Belle S. Wheelan, President, SACS (May 13, 2021), https://www.scribd.com/document/508024434/SACS-Letter-to-Sydney-Kitson [https://perma.cc/XC2R-6FTU]; Divya Kumar, *Richard Corcoran out of FSU presidential search; three academics move*

*on*, TAMPA BAY TIMES (May 15, 2021), https://www.tampa-bay.com/news/education/2021/05/15/richard-corcoran-out-of-fsu-presidential-search-three-academics-move-forward/ [https://perma.cc/GA5F-WEMH].

Until recently, a college or university was assigned an institutional accreditor based on its geographic region. But in 2019, the Department of Education revised its regulations to permit institutions to switch to an accreditor outside their region. *See The Secretary's Recognition of Accrediting Agencies*, 84 Fed. Reg. 58,834, 58,893 (Nov. 1, 2019) (explaining that the regulations removed "geographic area of accrediting activities" from the definition of "scope of recognition or scope"). Florida's legislature took advantage of this regulatory revision and passed a law directing its public colleges and universities to switch to an accreditor that the Florida Board of Governors or State Board of Education had approved. FLA. STAT. § 1008.47(2)(a) (2023).

Florida has now sued the Secretary of Education and several Department of Education officials, maintaining that the accreditation requirement is unconstitutional. Florida brought four claims: a private nondelegation doctrine challenge, an Appointments Clause challenge, a Spending Clause challenge, and a now-abandoned Administrative Procedure Act challenge. The federal government moved to dismiss, and the district court granted the motion. The district court explained that there was no private nondelegation issue because accreditation is not a legislative function, the government maintains ultimate decision-making authority

over Title IV funds, and accreditors are not promulgating generally applicable rules. The court added that the Spending Clause claim was meritless because Title IV funds go to students and not institutions, and in any event, the accreditation requirement is unambiguous and not overly coercive. And the court dismissed the Appointments Clause claim because accreditors do not determine eligibility for Title IV funds.

Florida timely appealed.

## II.

We review *de novo* a district court's grant of a 12(b)(6) motion to dismiss for failure to state a claim, "accepting the complaint's allegations as true and construing them in the light most favorable to the plaintiff." *Simone v. Sec'y of Homeland Sec.*, 156 F.4th 1212, 1215 (11th Cir. 2025) (citation modified). We review questions of statutory interpretation *de novo*. *Id.* at 1216. We also review constitutional questions *de novo*. *United States v. Osburn*, 955 F.2d 1500, 1503 (11th Cir. 1992).

## III.

Florida argues that the district court should not have dismissed its constitutional claims. Those claims identify two alleged infirmities in the Department of Education's reliance on accreditors. First, in Florida's view, these private accreditors exercise governmental power by determining eligibility for Title IV funding. If that's so, Florida says it creates related constitutional problems. There would be an Article I delegation-of-power problem because

the statute delegates that authority without sufficient supervision. And, along the same lines, there would be an Appointments Clause problem because these accreditors have not been properly appointed to act as federal officers. Second, even if the accreditors are not exercising governmental power, Florida says that the condition requiring accreditation is an unconstitutional exercise of Congress's Spending Clause power because it is unascertainable. Florida argues that colleges and universities can never really know what they must do to satisfy a private accreditor, so the condition requiring accreditation is too uncertain to be constitutional.

We will address each issue in turn. We ultimately agree with the Department of Education that private accreditors are not exercising governmental authority—so there is no constitutional infirmity with the delegation of such authority or the failure to appoint accreditors as executive branch officers. We also think that the accreditation requirement is an ascertainable condition that Congress may attach to federal funds.

*A.*

We begin with Florida's nondelegation and Appointments Clause theories, which are two sides of the same coin. Florida says that the law unconstitutionally delegates to private accreditors the government's authority to decide who is eligible for Title IV funds (nondelegation), and, if accreditors want to perform the task, they must be properly appointed as executive branch officers (Appointments Clause). We will unpack each theory, but the bottom line is

the same: both theories fail because, under the statutory scheme at issue here, accreditors are not exercising government authority.

1.

Let's start with Florida's nondelegation theory—that accreditors are exercising government power that properly belongs to the legislative or executive branches. Generally, the government cannot delegate legislative, executive, or judicial authority to private parties. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (holding that "legislative delegation" and regulatory delegation to private parties is unconstitutional). The Article I, II, and III Vesting Clauses vest "legislative Powers," "[t]he executive Power," and "[t]he judicial Power" in Congress, the President, and the federal judiciary, respectively. *See* U.S. CONST. art. I, § 1; *id.* art. II, § 1; *id.* art. III, § 1. The vesting of these three powers is exclusive, meaning that the three branches cannot give away their power. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935) (explaining that Congress may not "transfer to others the essential legislative functions with which it is thus vested"). At a minimum, the Vesting Clauses prevent the delegation of power to a private party to the same degree they prevent the delegation of one branch's power to a government actor in another branch. *See Oklahoma v. United States*, 163 F.4th 294, 305 (6th Cir. 2025) (explaining that "unchecked delegations to private entities violate core separation-of-power guarantees"); *Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004) (similar); *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 87–88 (2015) (Thomas, J., concurring) (explaining that the

10                    Opinion of the Court                    24-13814

private nondelegation doctrine "flows logically from the three Vesting Clauses"); *Consumers' Rsch., Cause Based Com., Inc. v. Fed. Commc'ns Comm'n*, 88 F.4th 917, 935 (11th Cir. 2023) (Newsom, J., concurring) (writing that the private nondelegation doctrine flows from structural Vesting Clause concerns).

Of course, the delegation of government authority to a private party raises Due Process concerns as well. Private parties may be more likely than government actors to be self-interested or to act arbitrarily. *See Carter Coal*, 298 U.S. at 311. But States like Florida do not have Due Process rights. The Due Process Clauses protect "person[s]" against the government, U.S. CONST. amends. V, XIV, not the States against the federal government. *Cf. Deshaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) (explaining that the Due Process Clause "is phrased as a limitation on the State's power to act"). For that reason, Florida has wisely conceded away any private nondelegation theory that depends on the Due Process Clause.

Florida has a similar Appointments Clause theory, arguing that accreditors are wielding executive power without having been appointed to be executive officers. The Appointments Clause provides that all "Officers of the United States" must be appointed in a specific way depending on whether they are principal or inferior officers. U.S. CONST. art. II, § 2, cl. 2. But for the Appointments Clause to apply at all, the person or entity in question must exercise significant government authority, *Edmond v. United States*, 520 U.S. 651, 662 (1997), and occupy an office that is "established by Law,"

U.S. CONST. art. II, § 2, cl. 2. Significant authority can include promulgating rules, adjudicating public rights, or determining eligibility for funds or elected office. *Buckley v. Valeo*, 424 U.S. 1, 140–41 (1976) (holding that the Federal Election Commission exercised significant government authority through "rulemaking, advisory opinions, and determinations of eligibility for funds and even for federal elective office itself"). Significant authority also includes taking testimony, conducting trials, ruling on admissibility of evidence, and enforcing compliance with discovery orders. *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 881–82 (1991); *Lucia v. SEC*, 585 U.S. 237, 248 (2018).

2.

The problem for Florida's theories is that accreditors do not exercise the kind of government authority that could violate the Vesting Clauses or the Appointments Clause. Florida asserts that accreditors exercise government power in the form of legislative rule-setting power and executive decision-making power. But a wall of precedent establishes that accreditors exercise neither kind of authority.

To begin with, private educational accreditors preexisted the Higher Education Act. Their power to accredit comes not from the federal government, but from their member institutions who voluntarily submit to their authority and by-laws. *See North Dakota v. N. Cent. Ass'n of Colls. & Secondary Schs.*, 99 F.2d 697, 700 (7th Cir. 1938) (explaining that membership in an accrediting agency is "purely voluntary"); HEGJI, *supra*, at 4 (explaining that institutions

12                    Opinion of the Court                    24-13814

voluntarily submit to accreditation). Private accreditors do not rely on any delegation of government power to do what they have always done: accredit their member educational institutions.

Even though accreditation has a bearing on eligibility for Title IV funding, this connection does not mean that accreditors are exercising Congress's spending power. U.S. CONST. art. I, § 8, cl. 1. States routinely rely on similar, privately controlled institutions to make decisions about who is qualified to receive a license or benefit. For example, many States (including Florida) require applicants for certain professional licenses to have graduated from an accredited program or institution.[1] Courts have explained that, even

---

[1] *See, e.g.*, *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1203 (11th Cir. 2015) (recognizing that Florida requires applicants for licenses to work as certified registered nurse anesthetists to have graduated from an accredited program and be certified by a private organization (citing FLA. STAT. §§ 458.3475, 459.023)); *McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 520–21 (3d Cir. 1994) (explaining that Pennsylvania will only recognize the education or degrees obtained from accredited medical residency programs (citing 63 PA. CONS. STAT. §§ 422.2, 422.23(c))); ALA. CODE § 34-39-8(1) (2026) (requiring applicants for an occupational therapy license to have completed an accredited program); COLO. REV. STAT. § 12-205-108(1)(a)–(b) (2020) (requiring applicants for an athletic training license to have earned a degree from an accredited college or university and completed an accredited program); CONN. GEN. STAT. § 20-10 (2026) (requiring certain applicants for medical licensure to have graduated from an accredited medical school or program); DEL. CODE ANN. tit. 24, § 2817(1)(a) (2025) (requiring certain applicants for a professional engineering license to have graduated from an accredited program); GA. CODE ANN. § 43-11-71(a) (2026) (requiring dental hygienists to have graduated from an accredited program); LA. STAT. ANN. § 37:2805(B)(1)(d) (2023) (requiring applicants for a chiropractic license to have

24-13814                Opinion of the Court                13

though private accreditors play a significant role in state licensure requirements, accreditors performing these roles are not state actors. *See, e.g.*, *McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 524 (3d Cir. 1994) (holding that an accreditor did not perform state action even though Pennsylvania only recognized degrees from accredited programs); *cf. Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 250 (7th Cir. 1994) (holding that a private medical Board was not a state actor even though "states make certification by the Board a prerequisite for some public positions").

---

graduated from an accredited college or university and an accredited chiropractic school); MD. CODE ANN., HEALTH OCC. § 13-303(a)(1) (2020) (requiring certain applicants for a physical therapy license to have graduated from an approved or accredited program); MASS. GEN. ANN. LAWS ch. 112, § 23I(b) (1982) (requiring certain applicants for a physical therapy license to have graduated from an accredited program); MISS. CODE ANN. § 73-31-13(d) (2025) (requiring applicants for a psychologist's license to hold a doctoral degree in psychology from an accredited or authorized institution of higher education); OHIO REV. CODE ANN. 4741.11 (2016) (requiring certain applicants for veterinary licenses to have graduated from an approved or accredited veterinary college); S.C. CODE ANN. § 40-33-36(D)(1)(d), (E)(1) (2021) (requiring applicants for a graduate nurse license to complete an accredited basic nursing education program within one year of seeking licensure); TENN. CODE ANN. § 63-4-108(1) (2026) (requiring applicants for chiropractic licenses to have graduated an accredited or approved chiropractic college); TEX. OCC. CODE ANN. § 605.252(b)(1) (2017) (requiring that applicants for an orthotics or prosthetics license hold a degree from an accredited program or a program with equivalent standards); VA. CODE ANN. § 54.1-2709(B)(ii) (2017) (requiring that applicants for a dentistry license have graduated from an accredited dental school or department).

In assessing similar arguments, we have also explained that Congress's decision to use private accreditation as a signal of institutional quality does not transform accreditors into government actors. Despite the important role that private accreditation plays in eligibility, the Department of Education "has never delegated to [private accreditors] its authority to terminate federal funds." *Hiwassee Coll., Inc. v. S. Ass'n of Colls. & Schs.*, 531 F.3d 1333, 1335 & n.3 (11th Cir. 2008). As they have done for over a century, accreditors decide whether to accredit (a private decision), and the federal government decides whether to fund (a government decision). *See Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Tech. Schs.*, 817 F.2d 1310, 1313 (8th Cir. 1987) (explaining that accreditation decisions are "not attributable to the federal government," but are "private actions to which the government responds"); *Pro. Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161, 169 (4th Cir. 2015) ("Accreditation agencies are private entities, not state actors . . . .").

In a similar vein, our sister circuits have recognized that a funding condition that amounts to a "legitimate request[] for input" from a private organization is not a delegation of government authority. *State v. Rettig*, 987 F.3d 518, 531 (5th Cir. 2021); *see also U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004) (stating the general rule). Accordingly, the federal government may condition approval on a private party's certification if there is "a reasonable connection between the outside entity's decision and the federal agency's determination." *See Rettig*, 987 F.3d at 531 (quoting *U.S. Telecom Ass'n*, 359 F.3d at 567). We agree. And, here, there is

really no debate that the accreditation requirement is reasonable. It is obviously connected to Congress's goal that federal student aid flow to high quality institutions. The history of private accreditation underscores the reasonableness of relying on that kind of preexisting practice.

Finally, private accreditors are not executive officers because they do not exercise any functions recognized as significant government authority, nor do they occupy an office that was "established by Law." U.S. CONST. art. II, § 2, cl. 2. Unlike the rulemaking, advisory opinions, and eligibility determinations of the Federal Election Commission in *Buckley*, *see* 424 U.S. at 140–41, accreditors' standards and decisions are not generally applicable. Their accreditation decisions apply to a single institution, and their standards apply to a discrete number of voluntary member institutions. Private accreditors also do not adjudicate public rights or perform classic government functions. Unlike in *Freytag* and *Lucia*, accreditors do not conduct trials, take testimony, rule on admissibility of evidence, or enforce compliance with discovery orders. *See Freytag*, 501 U.S. at 881–82; *Lucia*, 585 U.S. at 247. Moreover, private accreditors preexisted the Higher Education Act and continue to perform the same function they always have. They therefore do not occupy an office "established by Law," which is required to trigger the Appointments Clause. U.S. CONST. art. II, § 2, cl. 2.

In short, Congress's decision to use private accreditation as a signal of institutional quality does not delegate legislative or executive power or require accreditors' appointment as executive

branch officers. Because accreditors are not exercising legislative or executive power, the government's reliance on accreditation as an indication of quality does not violate the Vesting Clauses or Appointments Clause.

*B.*

We turn now to Florida's Spending Clause claim.

There are limits to the conditions Congress can impose under the Spending Clause when it gives money to States. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 & n.13 (1981). Among other things, those conditions must be ascertainable. *Id.* at 17; *see also South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (explaining that Congress's conditions must be unambiguous). The ascertainability requirement reflects the consent-based approach of State-directed Spending Clause legislation, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022), and enables States "to exercise their choice [to accept funds] knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17.

The district court concluded that the ascertainability requirement doesn't apply to the accreditation condition on Title IV funds because those funds only indirectly flow to States through the educational choices of students. We will assume without deciding, however, that the ascertainability requirement applies. Indulging that assumption, the federal government argues that the accreditation condition is ascertainable because it is straightforward

for an institution to determine whether it is accredited. Florida disagrees, arguing that the standards that private accreditors apply can be nebulous and change unpredictably.

We agree with the federal government. Congress need not "prospectively resolve every possible ambiguity concerning particular applications of the requirements of [a federal grant program]." *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985). The point is that Congress must "make the existence of the condition itself—in exchange for the receipt of federal funds—explicitly obvious." *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (quoting *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002)). That condition here is accreditation by a recognized accreditor.

The accreditation condition does not become ambiguous just because it could have diverse applications depending on the accreditor and the institution. In *Benning*, for example, we held that the Religious Land Use and Institutionalized Persons Act imposed an ascertainable condition on recipients of federal funds when it applied strict scrutiny to any of their actions that substantially burdened religious exercise. 391 F.3d at 1306. There, we acknowledged that under strict scrutiny, state actions that constituted discrimination could "vary widely," but we still held that this funding condition was a well understood means-end test that was "far from ambiguous." *Id.* In the same way, as the federal government points out, accreditation has been around for over a century and is a well understood system. We have no doubt that the standards are ascertainable.

Florida cites our decision in *West Virginia ex rel. Morrisey v. U.S. Department of the Treasury*, 59 F.4th 1124 (11th Cir. 2023), but it offers no support. In *Morrisey*, we considered whether a provision of the American Rescue Plan Act violated the Spending Clause's ascertainability requirement. The provision prohibited States from using federal funds to offset "directly or indirectly" any reduction in net tax revenue resulting from a change in state law. *Id.* at 1132 (quoting 42 U.S.C. § 802(c)(2)(A)). We concluded that the offset provision was not ascertainable for three reasons: (1) it did not provide a baseline standard against which to measure net tax revenue, (2) the words "directly or indirectly" made it an "extraordinarily expansive" condition considering the fungibility of money, and (3) it was a novel restriction aimed at a State's entire budget. *Id.* at 1144–46 (citation modified). None of these reasons apply here. Colleges and universities know whether they are accredited, the accreditation condition doesn't encumber a State's entire budget, and accreditation is not novel in any way. We reject the State of Florida's comparison between this case and *Morrisey*.

Because accreditation is an ascertainable condition on federal funds, it does not violate the Spending Clause.

## IV.

The district court's order of dismissal is **AFFIRMED**.